(No. 70365.

JANE DREWS, as Special Adm'r of the Estate of Randall Drews, Deceased, and Indiv., Appellee, v. GOBEL FREIGHT LINES, INC., Appellant.

*Opinion filed June 20, 1991.—Rehearing denied September 30, 1991.*

HEIPLE, J., dissenting.

Clausen, Miller, Gorman, Caffrey & Witous, P.C. (James T. Ferrini, Edward M. Kay and Richard R. Winter, of counsel), and Richard L. Berdelle, of Pretzel & Stouffer, Chrtd., all of Chicago, for appellant.

Albert F. Hofeld and Howard Schaffner, of Hofeld & Schaffner, of Chicago, for appellee.

Cassidy & Mueller, of Peoria (David B. Mueller, of counsel), for *amicus curiae* Illinois Association of Defense Trial Counsel.

George M. Elsener and Michael J. Teather, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Jane Drews, individually and as special administrator of the estate of her husband, Randall Drews (decedent), brought this lawsuit in the circuit court of Cook County against the defendant, Gobel Freight Lines, Inc., seeking recovery under the Survival Act (Ill. Rev. Stat. 1983, ch. 110½, par. 27—6), the Wrongful Death Act (Ill. Rev. Stat. 1983, ch. 70, par. 2), and the

Rights of Married Women Act (Ill. Rev. Stat. 1983, ch. 40, par. 1015). Decedent was killed in August 1985, when his rented camper-van and one of defendant's tractor-trailer trucks collided. Prior to trial, defendant conceded liability, and the case proceeded to a jury trial solely on the issue of damages. The jury returned a verdict of $150,000 for decedent's pain and suffering, $7,100 for decedent's medical and funeral expenses, and $8,336,000 for wrongful death.

The trial court entered judgment on the verdict for $8,493,100, and denied defendant's motion for a new trial or, alternatively, a remittitur. The defendant then appealed from the wrongful death award, and the appellate court affirmed the verdict (197 Ill. App. 3d 1049). Pursuant to Supreme Court Rule 316 (134 Ill. 2d R. 316), the appellate court certified the following question of importance for direct appeal to this court:

> "Whether in an action for wrongful death pursuant to Chapter 70, Section 1 and 3 (Ill. Rev. Stat.) the jury should be instructed that loss of society, which according to the dictate of the Illinois Supreme Court constitutes 'pecuniary injuries' within the purview of the statute, should be reduced to present cash value."

The three issues on appeal are whether: (1) damages for future loss of society should be reduced to present cash value; (2) the jury award is excessive; and (3) the amount of the jury award was inflated due to errors that occurred during trial.

As the only issue at trial was damages, there was no evidence presented concerning the nature of the accident. There was however, extensive testimony about the character and life of the decedent from his wife, friends, neighbors, parents, professional associates, and others. He was described as an outstanding young man who was a loving husband and a devoted father. The decedent's mother testified: that he would use his own truck to help

strangers in a snowstorm; that he once helped a pregnant woman; and that he sometimes helped widows. Decedent's friends and neighbors described him using terms such as "eager to help others—the all-American guy," "most memorable person," and "all you were looking for in young America *** a great neighbor and friend."

Decedent's wife testified that he was a romantic husband and caring father, and that they participated in many activities together (e.g., they built their house together). The decedent was 32 years old at the time of his death, and his two sons were approximately three years old and three months old. Videotapes and photographs were admitted showing the decedent participating in family activities, as well as teaching his son how to swim and hit a golf ball.

The first person who arrived at the accident scene, and the paramedic who attended to the decedent, described the pain and suffering the decedent endured during the 30-minute period, in which, while he was conscious, "he was being cut from the car." Dr. Robert Kirschner, a forensic pathologist who performed an autopsy on the decedent's body, testified that the decedent had blunt trauma injuries to his head, trunk, and extremities, that there was a "deep gaping laceration" on the rear portion of the left thigh, a "mangling injury to the right leg at the knee region," hemorrhaging on and under the surface of the brain, bleeding within the lung and chest cavity, a laceration of the liver, and that there were fractures to numerous bones throughout the body. He further testified that the injuries would cause severe pain and suffering in a conscious person. Over defendant's objections, the trial court admitted certain photographs of the accident scene, and morgue photographs of the decedent's injuries.

The plaintiff also presented testimony concerning decedent's abilities as an insurance salesman, as well as the potential future earning he would have made after he completed his purchase of his parent's insurance agency (planned for January of 1986).

As the only issue in this trial was the plaintiff's damages, the defendant offered the testimony of two witnesses to educate the jury about the time-value of money. The defendant initially presented the testimony of an employee of the Federal Reserve Bank of Chicago, who testified that at the time of trial the last issue of a United States Treasury 30-year bond had a 9.125% rate of interest. Additionally, a professor of mathematics at the Illinois Institute of Technology testified for the defendant concerning the concept of present cash value.

The appellate court affirmed the trial court, finding that an award for loss of society "should not be reduced to present cash value" (197 Ill. App. 3d at 1058), and that the verdict was not based on sympathy and prejudice, and therefore was not excessive (197 Ill. App. 3d at 1059). It also found that none of the alleged trial errors were sufficient to lead to a presumption that the verdict was excessive. The court then granted defendant's petition to issue a certificate of importance (134 Ill. 2d R. 316), and this appeal followed. The Illinois Association of Defense Trial Counsel and the Illinois Trial Lawyers Association filed *amicus curiae* briefs, in support of the defendant and the plaintiff, respectively.

The first issue to be resolved is whether an award for loss of society in a wrongful death case should be reduced to present cash value. The trial court gave an instruction (see Illinois Pattern Jury Instructions, Civil, No. 31.04 (3d ed. 1990)) (hereinafter, IPI Civil 3d) stating that pecuniary loss includes:

"society, companionship, conjugal relationship, money, goods and services the decedent might reasonably have been expected to contribute to the widow and two sons."

The trial court also instructed the jurors that "[d]amages for loss of society, companionship and conjugal relationship are not reduced to present cash value." (See, *e.g.*, IPI Civil 3d No. 34.02.) The trial court additionally refused to give defendant's tendered jury instruction which, contrary to the aforementioned instructions, would have instructed the jury that all pecuniary benefits, including loss of society, are to be reduced to present cash value.

In pertinent part, section 2 of the Wrongful Death Act states that "the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, to the surviving spouse and next of kin of such deceased person." (Ill. Rev. Stat. 1983, ch. 70, par. 2.) The Act additionally states that "the jury shall determine the amount of damages to be recovered without regard to and with no special instruction as to the dollar limits on recovery ***." Ill. Rev. Stat. 1983, ch. 70, par. 2.

In *Elliott v. Willis* (1982), 92 Ill. 2d 530, 541, this court held that a jury may consider the loss of society, companionship and conjugal relationship that constitute loss of consortium as compensible pecuniary damages for wrongful death. The court also noted that "[a]ll of the elements that comprise what is considered to be loss of consortium may not be the most tangible items, but a jury is capable of putting a monetary worth on them." (*Elliott*, 92 Ill. 2d. at 540.) Loss of consortium is thus appropriately considered as part of this court's interpretation of "pecuniary injuries" under the Wrongful Death Act. Ill. Rev. Stat. 1983, ch. 70, par. 2.

The defendant and *amicus* Illinois Association of Defense Trial Counsel argue that since damages for loss of

society are pecuniary in nature, the damage award must be reduced to present cash value so that it conforms with sound economic and public policy principles. Essentially the defendant and *amicus* argue that all damages compensible under the plain wording of the Act are "pecuniary," and therefore "economic," damages which should be reduced to present cash value.

The issue of whether or not damages for loss of society in a Wrongful Death Act case should be reduced to present cash value is a matter of first impression before this court. However, the appellate court has previously examined the issue. (See *Singh v. Air Illinois, Inc.* (1988), 165 Ill. App. 3d 923; *Exchange National Bank v. Air Illinois* (1988), 167 Ill. App. 3d 1081; *Lorenz v. Air Illinois, Inc.* (1988), 168 Ill. App. 3d 1060 (collectively referred to as the *Air Illinois* cases); *Goad v. Evans* (1989), 191 Ill. App. 3d 283.) All of the previous appellate court decisions have held that, in a wrongful death action, damages for loss of society should not be reduced to present cash value. The defendant argues that the *Air Illinois* cases lack precedential value and were improvidently decided, thus requiring that this court overrule them. An in-depth analysis of the holdings in the *Air Illinois* cases is not necessary for disposition of the issue in the present case. An analysis of the decisions of our sister States reveals that the decisions in the *Air Illinois* cases and in *Goad* revealed the majority view, and sound public policy.

In *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 25, this court held that an award for pain and suffering in a personal injury case should not be reduced to present cash value. The court noted that "[u]nder Illinois law, future damages for medical expenses and lost earnings are to be discounted to present cash value, but damages for pain and suffering, disability, and disfigurement are not to be discounted to

present cash value." (*Schaffner*, 129 Ill. 2d at 24-25.) The court's reasoning in *Schaffner* applies equally to pain and suffering in the wrongful death context and is instructive for the resolution of the instant case.

The defendant relies heavily on the case law in Michigan and the Second Circuit Court of Appeals. The defendant asserts that cases interpreting Michigan law stand for the proposition that damages for loss of consortium should be reduced to present value. (See *Wycko v. Gnodtke* (1960), 361 Mich. 331, 105 N.W.2d 118; *McKee v. Michigan Department of Transportation* (1984), 132 Mich. App. 714, 349 N.W.2d 798; *Clissold v. St. Louis-San Francisco Ry. Co.* (6th Cir. 1979), 600 F.2d 35 (construing Michigan law).) However, under Michigan law, all damages are reduced to present value. (*Clissold*, 600 F.2d at 38.) Unlike Illinois, the Michigan courts have determined that damages such as pain and suffering, and disability and disfigurement, as well as loss of consortium and companionship, should be reduced to present value under its wrongful death act. Since certain damages, such as pain and suffering, are not reduced to present value in Illinois (*Schaffner*, 129 Ill. 2d at 24-25), the Michigan precedent is of little value in this court's analysis of the issue.

The Second Circuit Court of Appeals has held that loss of society should be reduced to present cash value. (*Chiarello v. Domenico Bus Service, Inc.* (2d Cir. 1976), 542 F.2d 883.) Like Michigan, the court in *Chiarello* held that all damages, including future pain and suffering and loss of consortium, are to be reduced to present value. (*Chiarello*, 542 F.2d at 887.) Thus, since pain and suffering are not reduced to present value in Illinois (*Schaffner*, 129 Ill. 2d at 24-25), the analysis of the Second Circuit is not helpful in resolving the instant case. Furthermore, the Second Circuit has recently questioned

the validity of the rule requiring that all damages be reduced to present value, noting:

> "If we were writing on a clean slate, we might be inclined to accept the view of the other circuits and reject any discounting of future non-pecuniary losses. However, we are obliged to reckon with the clear preference for discounting [non-economic damages to present value] expressed by this Circuit in *Chiarello* \*\*\*." *Oliveri v. Delta Steamship Lines, Inc.* (2d Cir. 1988), 849 F.2d 742, 751.

Moreover, other jurisdictions have rejected the analysis of the Second Circuit in regards to pain and suffering. For example, the Eighth Circuit Court of Appeals (discussing damages for future pain and suffering, but the court's analysis is applicable to damages for future loss of consortium) noted:

> " 'The application of the present value rule by the jury in making up the amount of damages to be allowed for the deprivation of pecuniary benefits arising from probable future earnings is not only just, but feasible. It is feasible because the jury may from actual past earnings, with other factors in the problem proven, set opposite each year of the estimated life the sum which would probably be earned that year, and in death cases the probable pecuniary benefit to the party complaining or beneficially interested. These several sums can then be reduced to their present value. No such process is possible in estimating the amount to be allowed for pain and suffering, or for pain and inconvenience. In the matter of pain, suffering, or inconvenience, no books are kept, no inventories made, no balances struck.
>
> Neither the plaintiff in the case nor any one else in the world has ever established a standard of value for these ills. The only proof ever received to guide the jury in determining the amount of the allowance they should make is, broadly stated, the nature and extent of the injury, its effect and results. They are instructed to allow a reasonable sum as compensation, and in determining what is reasonable under the evidence to be guided by their observation, experience and sense of fairness and

right. At the best the allowance is an estimated sum determined by the intelligence and conscience of the jury, and we are convinced that a jury would be much more likely to return a just verdict, considering the estimated life as one single period, than if it should attempt to reach a verdict by dividing the life into yearly periods, setting down yearly estimates, and then reducing the estimates to their present value. The arbitrariness and artificiality of such a method is so apparent that to require a jury to apply it would, we think, be an absurdity.' " *Flanigan v. Burlington Northern Inc.* (8th Cir. 1980), 632 F.2d 880, 885-86, quoting *Chicago & North Western Ry. Co. v. Chandler* (8th Cir. 1922), 283 F. 881, 884-85.

Although the defendant notes a few cases that treat loss of consortium differently from pain and suffering for reduction to present value (see, *e.g., Aretz v. United States* (S.D. Ga. 1978), 456 F. Supp. 397; *Central Truckaway System, Inc. v. Harrigan* (1949), 79 Ga. App. 117, 53 S.E.2d 186), the majority of jurisdictions have refused to reduce loss of consortium to present value (see, *e.g., United States v. Hayashi* (9th Cir. 1960), 282 F.2d 599 (construing Hawaii Law); *Porter v. Funkhouser* (1963), 79 Nev. 273, 382 P.2d 216; *Umphrey v. Deery* (1951), 78 N.D. 211, 48 N.W.2d 897; *Bready v. Tipton* (Okla. 1965), 407 P.2d 194). The Ninth Circuit's analysis of Hawaiian law in the *Hayashi* case is instructive for this case. In determining whether damages for loss of consortium should be reduced to present cash value, the court looked to the history of Hawaii's wrongful death act and the historical development of the common law cause of action for loss of consortium, in denying the reduction. The court noted that damages under the Hawaii Wrongful Death Act were initially contemplated for only financial loss, and that it was the common law which created a remedy for intangible losses. *Hayashi*, 282 F.2d at 605.

The Ninth Circuit recognized, as did the Hawaii Supreme Court, that items such as a wife's deprivation of

the society, comfort and fellowship of her husband were " 'difficult of exact estimation and to *** which no standard of value is applicable.' " (*Hayashi*, 282 F.2d at 605, quoting *Gabriel v. Margah* (1947), 37 Haw. 571, 581.) The court then went on to hold that compensation to a widow or child for loss of care, attention, acts of kindness, and the comfort from a deceased husband's or parent's society need not be reduced to present cash value. (*Hayashi*, 282 F.2d at 605.) Courts in other States have relied on the reasoning of *Hayashi* to come to the same conclusion (see *Porter v. Funkhouser* (1963), 79 Nev. 273, 382 P.2d 216; *Bready v. Tipton* (Okla. 1965), 407 P.2d 194), and the reasoning in *Hayashi* is valid and applicable to Illinois law.

The *Air Illinois* cases are fully in accord with the majority of foreign jurisdictions, and represent an analysis consistent with the public policy of Illinois. In *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 24-26, this court held that noneconomic loss for pain and suffering, disability, and disfigurement are not to be discounted to present cash value. That decision is persuasive and, as previously noted in this opinion, in accord with the decisions of the majority of other jurisdictions. The reasoning of *Schaffner* is fully applicable to the issue of loss of society in a wrongful death action.

The defendant argues that the plaintiff is receiving money now for a loss of consortium that will accrue over time and, thus, must be reduced to present cash value. However, as the plaintiff points out, that argument is fully applicable to pain and suffering, where this court has previously held that such damages are not reduced to present cash value. The question is not when the money is received, but rather it is whether future damages can be computed on a yearly basis with any certainty. Clearly, as both pain and suffering, loss of society,

and other noneconomic damages are incapable of being determined with any arithmetic certainty, present cash value analysis is completely inappropriate in determining an award. Thus, the trial court did not err in refusing to instruct the jury to reduce damages for loss of society to present value.

The next issue that the defendant raises is that the verdict is excessive because it is based on sympathy and prejudice. The defendant contends that the $8.3 million wrongful death award bears no relationship to the decedent's earning capacity, or his wife and children's loss of society. In support of this argument, the defendant cites *Roberts v. Stevens Clinic Hospital, Inc.* (W. Va. 1986), 345 S.E.2d 791. In *Roberts*, the parents of a 2½-year-old child, who died as a result of a nonconsensual biopsy, brought a wrongful death action against the hospital and treating physician. The jury returned a verdict, in favor of the plaintiff, for $10 million and the West Virginia Supreme Court found the award to be "monstrous and enormous," and reduced the award to $3 million. *Roberts*, 345 S.E.2d at 800.

Although we agree with the West Virginia Supreme Court that the jury's award in a wrongful death action should not be overturned unless it is obviously the result of passion and prejudice, thus falling outside the limits of fair and reasonable compensation, reduction is not appropriate in the instant case. The defendant presents numerous arguments concerning the decedent's potential future income, but it must be remembered that pecuniary injuries include such intangible, noneconomic injuries as loss of society and loss of consortium. Furthermore, "[j]udges are not free to reweigh the evidence" simply because they may have arrived at a different verdict than the jury. *Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 171.

During the trial on plaintiff's damages, both the plaintiff and the defendant presented evidence concerning the decedent's potential future earnings. Contrary to the defendant's assertions, there was ample evidence presented from which a jury could deduce that, had he lived, the decedent would have had progressive and substantial increases in his income: he was 32 years old when he was killed in 1985; he had developed a positive reputation as an insurance salesman, and in 1985 he had been selected outstanding young insurance salesman in Illinois; and testimony showed that he was the leading salesman out of 3,000 agents in a three-State area for one company. Furthermore, in January 1986, the decedent planned on purchasing his parents' insurance agency, and a jury could have reasonably believed that the decedent would reap large financial gains in the future.

In addition there was unrebutted evidence presented that the decedent was an exemplary father and husband. As has already been stated in this opinion, the value of loss of society should not be reduced to present cash value, as it is not amenable to precise arithmetic calculations. In the instant case, there is every reason to believe that the loss of society and consortium suffered by the decedent's wife and young children was catastrophic. Thus, the jury verdict of over $8.3 million in damages for wrongful death is not outside the limits of fair and reasonable compensation.

The defendant finally argues that the verdict was a product of trial errors that resulted in passion and prejudice. Because the defendant alleges various issues of trial error, this court will look at each alleged error individually.

During the trial the plaintiff introduced: two short videotapes which depicted the decedent teaching his son to swim and play golf; photographs showing the decedent

and his wife sharing a picnic on the land on which they had chosen to build a new home; photographs showing the decedent physically building his new home; and photographs of the decedent with his son Kelly. The defendant does not allege that any of the video or photographic exhibits were not truthful or accurate. The rationale the plaintiff used to have the exhibits admitted was that they would convey the uncontested truth concerning the decedent's state of health, his relationship with his wife and children, and the services and instruction he provided his family. The defendant essentially contends that, despite their accuracy, the photographs and videos were cumulative and prejudicial, resulting in reversible error.

Video and photographic exhibits are admissible if the probative value of the exhibits is not outweighed by their inflammatory effect. (*Bullard v. Barnes* (1984), 102 Ill. 2d 505, 519-20; *Barenbrugge v. Rich* (1986), 141 Ill. App. 3d 1046, 1056; see also *Pisel v. Stamford Hospital* (1980), 180 Conn. 314, 323-24, 430 A.2d 1, 8.) Since there is no serious question as to the probative value of the exhibits, the only argument that the defendant makes is that they are inflammatory and prejudicial in their cumulative effect. As was true in *Barenbrugge*, defendant's argument is not persuasive, and the introduction of the video and photographic exhibits of the decedent and his family was not error.

In addition to the photographs of the decedent when he was alive, the plaintiff also introduced two photographs of the decedent taken at the morgue. The plaintiff argues that these photographs were submitted into evidence to support her claim for decedent's pain and suffering under the survival count of her complaint. One of the photographs shows the multiple lacerations to the decedent's face and throat, and the other photograph shows the gaping wound and burns to his right knee.

The defendant argues that the morgue photographs served no useful purpose, as they were merely cumulative and prejudicial. Because there was testimony from a witness, the responding paramedic, and a medical examiner, concerning the details of the decedent's injuries, the defendant argues that there was no need for the jury to see the photograph to comprehend the magnitude of the decedent's injuries. In fact, the defendant argues that each photograph was introduced into evidence solely because it is a "macabre picture of a corpse," and for no other reason. The only case the defendant cites in support of its contentions is *Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64. *Bart* has no application to this case, as it stands for the proposition that morgue photographs are irrelevant when no evidence has been presented that the decedent could have actually experienced pain and suffering after the accident. (*Bart*, 185 Ill. App. 3d at 69-70.) In the instant case, both an eyewitness, and a paramedic stated that the decedent was conscious immediately following the accident.

In *Bullard v. Barnes* (1984), 102 Ill. 2d 505, this court considered a similar argument concerning morgue photographs. The court stated:

> "If a photograph of a decedent has sufficient probative value it should be admitted in spite of the fact that it may be gruesome or inflammatory, and such a decision normally rests within the discretion of the trial court. [Citations.] We cannot say the trial judge abused his discretion in ruling that the photographs here at issue were not so inflammatory or gruesome as to outweigh their probative value in assisting the jury's determination of the extent of the decedent's pain and suffering." (*Bullard*, 102 Ill. 2d at 519-20.)

The morgue photographs at issue in the instant case are indeed gruesome. However, they are not so gruesome that it appears to us that the trial court abused its dis-

cretion in allowing them into evidence. Determining whether or not a photograph is too gruesome to be admitted is a very subjective decision. Such decisions are best left to the trial judge, who is best able to determine the possible prejudice of such photographs. As the trial court could have validly decided that the probative value of the photographs outweighed their inflammatory and prejudicial effect, this court will not upset that ruling.

The defendant also argues that the trial court erred in admitting a photograph which showed the defendant's and the decedent's vehicles following the accident. The defendant argues that, pursuant to a motion *in limine* that the trial court granted before trial, no evidence regarding the manner or cause of the accident was to be offered or admitted. The photograph showed the defendant's tractor-trailer surrounding and, to some extent, inside the decedent's crushed camper-van.

The plaintiff argues that she offered the photograph as evidence of the decedent's pain and suffering, and not to show any element of causation. The decision whether or not to admit photographs is reserved to the discretion of the trial judge. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 18-19; *Lindsay v. Appleby* (1980), 91 Ill. App. 3d 705, 710-11 (photographs of a vehicle, with blood on the roof, is not improper to show the magnitude of injury).) As the trial court could have validly determined that the photograph was relevant to show the extent of the decedent's pain and suffering immediately after the accident, this court does not find that there was any abuse of discretion on the part of the trial court.

In a related argument, the defendant claims that the prejudice of the accident scene photograph was compounded by three references plaintiff's counsel made concerning the accident. A review of the full context of

each reference shows that no improper references were made.

The first allegedly improper reference occurred during *voir dire* when plaintiff's counsel said: "[I]t was a semi-tractor trailer unit that hit the van that this young man was driving." A review of the context of the statement shows that it was made as part of questioning relating to a prospective juror's ties to the trucking industry. The statement did no more than advise the jury of an impact. The statement did not explain how or why the impact occurred, and the defendant was not prejudiced by the remark.

The second allegedly improper remark occurred during plaintiff's counsel's opening statement. After submitting the accident scene photograph as a demonstrative exhibit, plaintiff's counsel said: "I believe that this is Route 72 that I referred to earlier, and I believe that in the photograph you are looking eastbound, the direction that Randy [the decedent] was going." The defendant immediately objected to the statement, and the trial judge sustained the objection. The trial judge told the jury that the photographs of the accident scene were to be used only for the demonstrative purposes of showing the extent of impact, and in discussion of the decedent's injuries and damages. Clearly any prejudice that the remarks may have had was cured by the trial judge's admonishment to the jury. Furthermore, the defendant does not offer an explanation as to what prejudice resulted from plaintiff's counsel's statement. Instead, the defendant solely makes the bare assertion that the remark was prejudicial.

The third statement to which the defendant complains is one extrapolated from plaintiff's closing argument: "All of a sudden, like a flash, that camper is hit by the semi and the roof of that camper is taken off." This reference can only be understood when looked at in

the context of plaintiff's entire closing argument. In context, the statement was:

> "*All of a sudden, like a flash, that camper is hit by the semi, and the roof of that camper is taken off,* the front—the whole front roof, the whole thing here, is taken off in the accident.
>
> And he's moved from the driver's side to the passenger side, and in doing that, the right leg is moved and is ripped—the skin is ripped, the bone is exposed. The leg is destroyed, and he can't move that leg because it's pinned between the engine, which is on the inside of the camper, and the metal." (Emphasis added.)

After reading the statement in the context in which it was given, and in the context of the plaintiff's entire closing argument, it becomes clear that the statement was within the permissible range of commentary relating to the decedent's pain and suffering immediately following the accident, and thus was not prejudicial error.

Lastly, the defendant raises various allegations concerning trial errors to which it did not object to at trial, and raised for the first time in the appellate court. Defendant argues that this court should review these errors as "plain error." The defendant initially contends that statements made during plaintiff's closing argument, where plaintiff asked the jury to suppose what the decedent's last thoughts were, was so prejudicial as to amount to plain error. It is important to note that the jury was explicitly informed that the complained of argument applied to the survival count of the complaint, and not to the wrongful death count.

It is well settled that matters not objected to at trial are waived on appeal unless they are so egregious as to deny one a fair trial. (*Department of Public Works & Buildings v. Klehm* (1973), 56 Ill. 2d 121; *King v. Exchange National Bank* (1978), 64 Ill. App. 3d 335 (waived objections to remarks made during summation);

*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500 (waived objections to remarks made during summation); *Kinsey v. Kolber* (1982), 103 Ill. App. 3d 933 (waived objection to remarks made during *voir dire*).) The objectionable portion of plaintiff's closing argument was directed towards the decedent's pain and suffering before he died, and not to the wrongful death claim. The defendant's reliance on *Brant v. Wabash R.R. Co.* (1961), 31 Ill. App. 2d 337, and *Clarquist v. Kirschenman* (1977), 55 Ill. App. 3d 76, is misplaced. Unlike the defendant in the instant case, the defendants in *Brant* and *Clarquist* made contemporaneous objections to allegedly improper closing argument, thus preserving the issue for appeal. In the instant case, the jury awarded the plaintiff $150,000 for the decedent's pain and suffering, and this court finds that amount to be reasonable under the circumstances, and not a result of passion or prejudice.

The final allegation of error defendant raises is that a new trial is necessary because a prejudicial question by plaintiff's counsel was asked during the *voir dire* of a prospective juror. It was disclosed that the potential juror had a brother who was an attorney, and did work in the personal injury field. Plaintiff's counsel then inquired of the prospective juror as to whether his brother represented injured parties, or "worked for the insurance company."

The defendant did not contemporaneously object to this questioning but, instead, raised it for the first time in the appellate court. The defendant has thus waived the issue on appeal.

There were no trial errors that occurred that persuades this court that the award in the instant case is not fair and reasonable compensation for the wrongful death of the decedent. We do not find the award to be a

result of passion and prejudice, or a shock to the judicial conscience.

For the foregoing reasons the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE HEIPLE, dissenting:

Decedent lost his life in a motor vehicle accident when his rented camper-van and one of defendant's semi-trailer trucks collided. Defendant admitted liability in the widow's suit and the case went to trial solely on the issue of damages. The jury returned a verdict of $150,000 for decedent's pain and suffering, $7,100 for his medical and funeral expenses and $8,336,000 for wrongful death, the total award being $8,493,100.

It may be fairly said that the evidence at trial disclosed that the 32-year-old decedent was a fine young man and a father with two small children whose income was approximately $60,000 per year as an insurance salesman. He had the potential to increase his earnings. His life expectancy at the time of the accident was 39.4 years. His working life expectancy would have been something less.

The majority opinion defines the issues on appeal as whether: (1) damages for future loss of society should be reduced to present cash value; (2) the jury award is excessive; and (3) the amount of the jury award was inflated due to errors that occurred during trial.

Two things are apparent to me. First, that the widow and the children are entitled to a substantial verdict. Second, that the verdict which was returned was grossly excessive.

One million dollars given to the plaintiffs and invested at 6% would produce an annual return of $60,000 throughout the 39.4 year life expectancy of the decedent. Then, at the end of his life expectancy, the $1 million

would still be intact. Thus, taking into account the customary attorney's contingent fee of one-third, a verdict of $1.5 million would have given the lawyer a $500,000 fee and the widow and children the equivalent of the father's annual earnings plus a nest egg of $1 million to keep. What they got, however, was an award for $8,493,100.

The only calculable economic injuries in this case were the medical and funeral expenses which totaled $7,100 and the loss of earnings. As already noted, the jury fixed the sum of $150,000 for the decedent's pain and suffering. Thus, it is apparent that the bulk of the award, perhaps as much as $7 million, was for loss of society.

This case is illustrative of the irrational tort system under which we operate. The problem goes far beyond whether damages for pain and suffering and damages for loss of society should be reduced to present cash value. More basic than that, the law falsely pretends that such sufferings have a cash value when they clearly do not. No one can deny the reality of pain and suffering. No one can deny the reality of emotional suffering and the feeling of deprivation upon the loss of a loved one. These are real losses and real suffering. But they cannot be quantified with a dollar sign. As was observed in 1986 by the West Virginia Supreme Court, "if the measure of damages were the value of a human life then, arguably, no jury verdict could be excessive. The death of a family member *** involves inconsolable grief for which no amount of money can compensate. Counsel's suggestion that the [family] would not have traded [their child's] life for $10 million is entirely accurate—but they would not have traded [their child's] life for $100 million or even $1 billion." *Roberts v. Stevens Clinic Hospital, Inc.* (W. Va. 1986), 345 S.E.2d 791, 800.

By refusing to recognize any limits on such damage awards, litigants, with the assistance of their attorneys, are turning the court system into a giant gambling casino. Pain, suffering, or the loss of a loved one may produce incalculable wealth if only the person causing the injury is wealthy enough or carries enough insurance. Although these awards are passed off as compensation, they are really a form of punitive damages under another name. What we are witnessing here is a vast predatory movement of citizen against citizen, the magnitude of which is beyond calculation. All of this predation is taking place under the form of legal, political and governmental procedures. Though selected individuals are being made rich, most notably the plaintiffs' personal injury lawyers, society as a whole is crippling itself.

No corporation is large enough, no individual is rich enough, no amount of insurance coverage is high enough to prevent a defendant's financial destruction in a negligence law suit under existing standards. It is time for the courts to recognize that damages such as pain and suffering and loss of society do not have a quantifiable dollar value. If society is to allow compensation for such injuries, then society has a duty to limit recovery to some rule of reasonableness. This can be done by the State legislature with legislative limits or it can be done by the courts through ordering a reduction in jury verdicts by remittitur in appropriate cases. This is an appropriate case. The jury award is clearly excessive. While the exact dollar amount of the award may always be subject to disputation and is incapable of scientific measurement, I do believe that the jury award in this case should be subject to a remittitur of $6.5 million. That is to say, I would reduce the award of $8,493,100 to $1,993,100.

Accordingly, I dissent from the decision of the court.